Third case this morning, Ponce-Flores v. Garland and Ms. Carl. That's correct, Your Honor. Good morning, Your Honor. Gabriela Querza, Carl. I'm here on behalf of the petitioner, Mr. Jesus Ponce-Flores. Can you guys hear me? Is the mic okay? Thank you. The agency found that Mr. Ponce-Flores, a green-lit gang defector who was recently stabbed by MS-13 while in U.S. custody, will face severe harm rising to the level of torture if he is deported to Honduras. The agency erred, however, when it held that that torture would not be by the hands of the Honduran government or by its acquiescence. In so deciding, the agency made three fatal errors. The first error was the agency applied an incorrect legal standard for torture when it held that Honduran police would not torture Mr. Ponce-Flores. The second was the agency failed to heed this court's decision, in that Gabriela Vazquez, Cruz Quintanilla, and the Attorney General's precedential decision in matter of OFAS, that it must factor the actions of low-level Honduran police into its government acquiescence analysis. The agency in this case also failed to meaningfully engage or provide cogent reasons why it did not engage with evidence, legally relevant evidence, to the government acquiescence analysis. A dissenting board member, pardon me, would have remanded on this basis alone. And this court has remanded on this basis in Alvarez-Lagos and Portillo-Flores. The first two issues are subject to a de novo review. And the last issue, we argue, should be an abuse of discretion standard of review. That said, even under a substantial evidence standard, we believe that there is no reasonable fact finder could hold that the Honduran government would not torture Mr. Ponce-Flores directly or do so with government acquiescence. We're asking the court today to grant the petition for review and vacate the agency's decision and reverse the agency's decision. And I'll begin with the risk of torture by and with government acquiescence. In Gavriela Vazquez in matter of OFAS, this court and also the agency held that one must consider the actions of low-level police officials when engaging in the acquiescence analysis. This court has also held in Alvarez-Lagos and Portillo-Flores that CAT analysis is highly fact-specific. And any analysis involved in CAT analysis has to reflect the individualized facts of the petitioner. And in this case, the agency's case, that CAT analysis does not reflect particular individualized facts that are extremely relevant to the analysis. First, the agency failed to consider that Mr. Ponce-Flores is a green-lit gang defector. And what that means is that he's a high-priority target for MS-13 and therefore also for any corrupt police officers within the Honduran police force. The MS-13 has recently stabbed him, indicating more proof that he's a high-priority target. And he's been in protective U.S. custody since that event. In addition, he is someone that the police, the agency ignored these factors that the police would be easy to find because he has tattoos, which identify him. I thought the agency mentioned the tattoos a number of times in his statement that he'd covered it up with other art. And the IG acknowledged that they might not totally cover it, but they cover it somewhat. There was discussion about that, wasn't there? Yes, Your Honor, that's correct. But what the agency ignored in her consideration is, while there were some tattoos that were covered up, there were several that were not covered up that would identify him, that identify him as someone who has gang ties, even if he has left the gang. And so those tattoos put him at risk. And that's an example of one of the individualized facts that was ignored in this case. Another aspect that wasn't fully considered is the deportation process. Mr. Ponce-Flores is going to be transferred from U.S. custody directly into Honduran custody with an official record that identifies him as someone with gang affiliation, although, again, he's left the gang. And that's because he has a conviction for gang participation. And so when he's being handed over to Honduran police, it'll make it much easier for him to find and both be victimized by corrupt and non-corrupt police officers. The corrupt police officers, obviously the reason would be that they're working with MS-13. But for the non-corrupt police officers in Honduras, gang participation or gang membership has been criminalized, and they're not going to concern themselves or ask him questions about whether he's left the gang or not. They're going to make assumptions about him because of his tattoos, because of the official record he has from the U.S. government, and they're going to... Wasn't there expert testimony about this that the agency considered? The agency disregarded evidence. So the agency really focused on... I assume the court, and please correct me if I'm wrong, is referring to Dr. Gutierrez's testimony about what would happen in the transfer from the United States to Honduras. And there, the agency really focused on just parts of the testimony, but actually on cross-examination. Dr. Gutierrez, and also in her affidavit, was very clear that the process for Mr. Jesus Ponce de Torres specifically would be that because of his official record for... the official criminal record that has this conviction for criminal gang participation because of his tattoos, that he is very likely to be transferred to Honduran police who would harm him, either because they're corrupt or because of how they treat gang members, even former gang members in Honduras. And the other thing that is critical to this case, an individualized fact that cannot be overlooked, and that this court and also the attorney general have urged the agency to take into consideration, is the actions of the low-level police officers. And again, that was a matter of OFAS and Covid-19. In both of those cases, and when you're considering government acquiescence, you have to look at the actions of those low-level officials as well. And that's something that the agency didn't engage with at all in her analysis. The agency discussed a lot of documentary evidence that you all submitted about what local police are doing. And the agency also discussed, well, there's been substantial efforts to try to get rid of the bad actors, but there still are bad actors as evidenced by the documents. I thought there was discussion about that. So what's the low-level actor evidence that the agency totally ignored? She ignored, and this is something that this court has held in Alvarez Lagos and Portillo Flores is really important not to ignore, which is the credible testimony and the credible affidavit from the petitioner himself talking about the actions he experienced and observed as a green-lit gang defector. I thought the agency mentioned that. I thought I read where she talked about his testimony and his affidavit, what he said happened to him, that he would stop when it was dark, those sorts of things. She doesn't talk. She sort of says that he vaguely talks about certain incidences, but she doesn't reference, and that's with respect to the beatings that he in fact regularly received from Honduran police when he was in the gangs, but she doesn't talk about the part in his affidavit where he says he observed MS-13 and the Honduran police harming green-lit gang defectors, and that's exactly who Mr. Ponce Flores is, and she ignores the risks that he faces because of that and his credible testimony to that effect. In addition, she ignores the testimony of his brother, which again in Alvarez Lagos and Portillo Flores, it was critical to consider this credible testimony about the neighborhoods, particularly in Alvarez Lagos, how the police are reacting right now to former gang members. So these are individual aspects of this case that the agency didn't really factor into her analysis and sort of ignored evidence that really would have allowed her to engage with these individualized facts. Another problem that happened in this case is, again, the legal error in failing to use the accurate definition of torture. When she concluded that the Honduran government would not torture Mr. Ponce Flores, the regulatory definition of torture is much broader than the one that the agency used. She relied on sort of a colloquial definition that the expert, Dr. Gutierrez, used when asked the question, is Mr. Ponce Flores going to be tortured by the Honduran government? She responded, well, he's not going to be cut up and dismembered. And the agency referred to that definition a couple of times in her analysis to conclude in agreement with the expert that he would not be subject to torture because of that. And actually the expert in her testimony talks about the fact that while he wouldn't be cut up and dismembered, he certainly would be subject to beatings. You read the IJ quoting your expert's statement about the police aren't going to cut him up, but they are going to potentially look the other way if X, Y, or Z happens. You read the IJ's quotation of that to mean that the IJ was substituting that for the legal standard that she quotes on page 9 of her opinion, that no, torture is not certain physical or mental pain or suffering rising to a certain level, but instead it's being cut up. You really, you think that's the actual holding of the IJ? And that she made a holding about torture, that that wasn't in the discussion of acquiescence, but it was about the definition of torture? Yes, Your Honor. At 69, I will just read from the opinion. Again, Dr. Gutierrez testified that police would not cut the respondent up and torture him, and that is not what she has come across with Honduran police. The respondent's risk of torturous harm by police or other authorities in Honduras appears minimal. She engages and applies that definition over and over again and really relies on that testimony for that proposition. So I do think, Your Honor, that that is the definition that she was really relying upon to come to her conclusion, and she certainly didn't talk about the other expert testimony that he would be beaten by police, and in fact that he's already been beaten by police, and she didn't talk about the expert's affidavit where she explicitly states that there would be no police protection for someone like Mr. Ponce-Fotis specifically. She had that finding in her affidavit. IJ did talk about the expert at great length, and the expert's testimony, although helpful to you, was qualified at kind of every stage of her conclusions. They were qualified along the way, and I thought the IJ did a thorough job of going through everything the expert said. But on this torture point, the BIA didn't rule on that ground, right? The BIA declined to rule on the definition of torture holding because of its ruling on other grounds. Well, yes, and we think that they should have ruled on it, because what we're talking about is whether they, yeah, the board decided because there's been a finding that there will be torture in the aggregate that it doesn't need to reach this issue of whether that torture will be by the Honduran government specifically. But that's what we're arguing, that the torture will be by the Honduran government, and that the agency really failed to consider both, applied an incorrect definition of torture and also failed to consider in its analysis the actions of low-level police officers within that analysis, again, as required by the attorney general matter of OFAS and also by this court. Can I ask, so how much, there's always going to be, I assume, some instances of low-level corruption, brutality in every government, ours included, frankly, so how much is too much? What's the standard? Well, I think what needs to, the question is, the question before this court and the question I think generally in each case, because these cases are very fact-specific, is can and will the Honduran government protect Mr. Ponce-Forez from torture? And we look at Mr. Ponce-Forez in order to make that determination, and because of his individualized facts and also the situation in Honduras, particularly with respect to the level of corruption there, it is highly unlikely, we think, it's likely that Mr. Ponce-Forez will be, will face torture by the Honduran government or with their acquiescence. Is that actually the right question under the cat? Isn't the question under the cat, first, how likely is the bad thing to happen? And second, if the bad thing happens, how likely is that because the government knowingly or with deliberate, you know, if the government with a culpable state, so I don't know if the question is how likely is the government to stop it. It's how likely is it that the government will fail to stop it and that that failure represents some sort of acquiescence on the part of the government. Isn't that actually the right question? Well, Your Honor, yes. I mean, so the first question is, is there willful blindness? And then the second question is, if you establish that there is willful blindness, and I think in this case the IJ has assumed that or the agency has assumed that, will there be a breach of, has the government breached its legal duty to protect Mr. Ponce-Forez or rather will they? And in order to make that determination, you need to both look at the individualized risk factors of Mr. Ponce-Forez and then you also need to consider what is the status of the government and what are they doing. Wait, you said, where did the agency assume there would be willful blindness? Well, she, I mean, she makes a finding that he's more likely than not going to face, have torture or face torture in the aggregate. And she includes... The fundamental challenge I have in all of these cases is that people use the word torture to mean two different things. They use torture to mean the bad thing happening to him. But that's not how the cat uses the word torture. The way the cat uses the word torture is it's not enough that the bad thing happens, the bad thing has to happen with the... And sometimes people... Correct. So sometimes people use the word torture when they mean only the first thing and sometimes they use torture when they mean both of the things collectively. I agree with you the IJ assumed the first part, that the bad thing is more likely to happen. But where's the evidence that they assumed it would be with the willful blindness or the acquiescence of the government? Well, we disagree with her finding that it would be with the acquiescence of the government. She makes that finding and she makes that finding because she is, one, ignoring a bunch of really legally relevant factors about Mr. Bonifatus, but she also makes that finding because she determines that although there is some corruption, that the government has taken some steps and that those steps have been successful to address that corruption. But when she does that, she cites to evidence that does not support that proposition at all. All of the efforts that she cites that the government has taken have all failed and all of that failure is documented within the very documents that she cites for that proposition. And that brings me to my third point, which is that this IJ failed to meaningfully engage with evidence. And not only did she ignore Mr. Fuentes Flores' affidavit, which he was deemed credible, his brother's affidavit, but also in her engagement of the evidence, it wasn't meaningful. This is a long decision. It is 14 pages long. Only one quarter of it is legal analysis. Only one quarter of it is legal analysis. And a few paragraphs of it is devoted to acquiescence. And in this whole discussion, I don't see a meaningful engagement with the evidence. In fact, I see a distorting of the evidence and an ignoring of the evidence. And a real attempt by this agency, although she cannot ignore the fact that he will face severe harm, to use the correct word in the analysis, if he's deported to Honduras, she goes out of her way to try to avoid the fact that that will be by the Honduran government or with its acquiescence. Ms. Carl, your time has expired. You've got some time for rebuttal. Thank you very much. Thank you. Ms. Pratt. Good morning, Your Honors. May it please the Court. Charisse Pratt for the Respondent, Merrick Garland. This case is about findings of fact and whether the agency's findings of fact are supported by substantial evidence. The standard of review is highly deferential. The immigration judge thoroughly considered the record evidence. Beginning on page 57, she cited to his, on page 59, she cited to his testimony that he has the green light, that MS-13 wants to kill him. Notably, he never alleges that Kumba works with the police. So if we're looking at police acquiescence, even though he says that Kumba has given him the green light, never in his testimony, in his affidavit, in the expert's testimony, never do they allege that Kumba is working with the police. On page AR-61, he said that he, the immigration judge acknowledged that he fears the ex-military in Honduras who are known as the Dark Shadows, who seek out current and former gang members and kill them. And she also acknowledges that he says that the police are corrupt, so he could not ask them for help. So she credits his testimony throughout. The IJ also cited his affidavit that he saw police kill people. This is on page AR-68. And she notes that he does not provide context for the incidents. Moving on to page AR-69, she cites extensively to the police, to the reports in the record. Exhibits V, X, Z. I'll just go through them. His affidavit at Exhibit N, pages AR-710 to 721, the psych evaluation, Exhibit X, AR-817, the expert affidavit of Dr. Eric Hirschberg, the United Nations High Commission on Refugee Report at page AR-890, 891, the International Crisis Group at page AR-1031, the U.S. State Department Human Rights Report at AR-1052, 1054. And it just goes on. That's all on page AR-69. Can I give you a hypothetical that I think illustrates the – so I mentioned to your friend on the other side the dilemma I have when people use the word torture to mean two different things. I think another problem I think I have in this case is what the government means. So can I give you a hypothetical that I think will help identify what is bothering me a little bit about this case? So imagine a world in which a single rogue police officer – but he's acting as a police officer. He's wearing his police uniform. He's at the police station. A single rogue police officer takes someone and delivers them up to MS-13 to be tortured and killed. And to be clear, when he does that, he is violating orders. He's violating the chain of command. The government – his chief prefers that he not do that. The government prefers that he not do that. The government has taken steps to root this corruption out. But he's just – he's the deeply embedded MS-13 agent that they've just missed. But he's wearing a police uniform. He's acting as a police officer. When that person is tortured and killed, that is within the meaning of the regulation with the acquiescence of the Honduran government. Correct? Yes, that sounds like it would be. Okay. And so the reason I say that is the mismatch I sort of perceive is I see the IJ, I see the agency, and I see the government in your brief saying, look, the Honduran government is doing the best they can to root out these bad apples. And that's commendable, and they should do that. But the fact is, if at the end of the day it is more likely than not that an individual rogue officer is likely to do what I just described, that would still be with the acquiescence of the government, right, no matter how hard the government tries to root it out. But the expert testified it's only a minority. Oh, no, no, no, I agree with you. It's just a conceptual matter, right? In other words, if I present evidence that an individual officer is likely to do something bad to me and the government presents evidence that says, the federal government, you, presents evidence that says the Honduran government is doing the best they can in a truly, really hard situation, those two things are sort of talking past each other, right, within the language of the cat. Because in the language of the cat, it doesn't matter how hard the central government is trying. It matters what's more likely than not in the world as it exists now. That's the bottom line. Is it more likely than not that the Honduran government would acquiesce to torture? No, no, no, see, now you've just reintroduced the Honduran government. Is it more likely than not that any individual person acting in government authority, right, would acquiesce to torture? So 50% or more likely than not that any individual acting in government would acquiesce to torture. The expert said no. The expert said there are a minority of corrupt officials and that when they're discovered, they are fired, arrested, prosecuted, and rooted out. And the immigration judge cited extensively to the reports detailing the large amount of gang members and the amount of police versus the small amount of the corrupt officials. So where is the cleanest point in the record where the IJ says that? The IJ says, I understand that it's not enough that the central government is trying to address this problem. I understand that it's not enough they fired a lot of bad officers. I understand the ultimate question is whether, as applied to this individual, it is not more likely than not that an individual rogue officer would acquiesce in his harm. What's the closest the IJ comes to saying that? I think it's on page AR70 where the immigration judge addresses the police turning in the MS-13. She specifically refers to the reports of corrupt police cooperating with gangs, including reports of Honduran authorities accepting payments from gangs in exchange for conceding authority or participating in criminal activity themselves. And she finds that reports in the record do indicate generally that impunity is widespread, that security forces are frequently in cahoots with gangs. So the IJ does not ignore that evidence. No, I understand she doesn't ignore it, but where does she make the finding? Because that evidence actually sounds good for him and bad for you. No, because then she defers to the expert who said that actually, even though these country conditions reports say that, the expert said it's actually in her testimony on pages 140 to 141 of the administrative record and on 151 that it's only a minority, and she reiterated it. But I guess the response to that is what your friend on their side said. Even if it's only a minority, from his perspective, it only needs to be one. It doesn't have to be 1,000 bad. From the law's perspective, it needs to be 50% or greater likely. Well, no, but from the law's perspective, it doesn't have to be that a majority of officers are bad officers. It has to be more likely than not that something bad will happen to this individual. And honestly, I guess what I'll say is if every single police department had 100 officers, only two of whom were bad, but those two would unerringly hunt down someone like him, it doesn't matter that 98% of the officers are good. And what matters is it more likely than not that something bad would happen to him as a result of the conduct of an officer, and where does the IJ say she considered that possibility and concluded that it's not more likely than not? I believe that she says that on page 8R70. Okay. Where? I see her talking about the government has fired a lot of bad officers, which again is commendable. She says, you know, to be sure, he faces a clear probability of being severely harmed and does face a risk of severe harm with the consent or acquiescence of the government. Still, she, what did she say? That police would probably meaningly respond in some form even if there is a chance that they would not. And even if there is a chance. But it doesn't matter if they respond. It matters if the bad thing ends up happening or not, right? And so, well, okay, so. And then the final paragraph she says, considering all evidence presented, the record does not establish that any minimal risk of severe harm to the respondent by authorities coupled with any risk of severe harm to him occurring with the consent or acquiescence of the government would equate with a clear probability of torture-level harm. So speculations are not enough that, oh, what if he runs into a lone corrupt officer? It has to be more likely than not. So if you have no further questions, I would rest on the briefs and the 28J letters. All right. Thank you, Ms. Pratt.  Ms. Carl. Thank you, Your Honors. My friend referenced what she believed to be a, represented a meaningful engagement with the evidence. But really that, the parts of the opinion that she was referring to are the 14 pages that, I'm sorry, the three-quarter pages that basically just engage in a summary of the evidence, listing the evidence. And this Court has held that there has to be meaningful engagement with the evidence. And barring meaningful engagement with the evidence, there has to, the Court has to provide, the agency has to provide cogent reasons for why they did not engage with the evidence. And here the IJ has disregarded and or mischaracterized evidence in her analysis, which is the last quarter of the decision. Can I ask you to respond to Judge Hyten's hypothetical? And let's assume instead of 100, it's a 10,000-member police force, and there are, I don't know, 10 absolutely corrupt, vicious, violent gang members in hiding in that police force. How many did you say, 10? Ten. Let's say 10. Ten. Whatever the number is, but a very small minority. But, you know, that alone wouldn't be enough, right? You would need to tie your client's, your petitioner's situation to those 10 officers, however many they are, and show a likelihood that those 10 officers would in fact do harm, the kind of harm that amounts to torture under the statute. I don't think the number matters, Your Honor. I think the impact of the corruption of those members matters. And so what is the power, what is the ability of those members? And as you were saying also, Your Honor, what is their engagement with or their likelihood of them engaging with and harming Mr. Ponce de Flores, which is why it's so important, which is why a matter of OFAS asked this court to consider the actions of low-level officials, which the court didn't do in this case, and which I think is alone, is on its own a basis for remand to ask her to consider what the actions of the low-level officials would be. Can I push back on the idea that the number doesn't matter at all? If it were 99 percent of the police force is in the pocket of the gangs, that would seem to make it really help a case that it's more likely than not that anyone who is opposing the gangs is going to be caught up by the police, right? But if it's a very small number, it doesn't prove, you have to show the personal connection, right, that there's some reason I think that this person is going to fall into the hands of one of these corrupt officers. Yeah, and also what is this person's particular risk factors? And in this case, you have a green-lit gang defector who's going to be transferred from U.S. custody to Enduran custody with this record that exposes him along with all of his tattoos. So you have to factor all of that into then the analysis involving the low-level officials and what the likelihood is that they're going to torture him directly or acquiesce to that torture. I, you know, the agency spends a lot of time talking about majority versus minority, borrowing the language of the expert, but I wanted to point out that a minority could still constitute 49 percent. So I think this getting into the numbers is less helpful. There have been other circuits that have held that the acquiescence standard, the agency really needs to provide clarity on the acquiescence standard. The first circuit recently in HHV Garland and then also the second circuit in Garcia Aranda, they have all asked the agency to provide clarity on what it means for a government to breach its legal duty to protect someone from torture. I do think that in this case, the agency had sufficient guidance to make the decision here because she failed to look at the actions of the low-level police officers and because of the other failings. To be fair, we've put an obligation on the agency in these cases to add up percentages, right? We don't require them to pin arbitrary numbers, but, you know, we've suggested you've got to show that you've considered all of them, added them together, and it still is not more likely than not. And the IJ tried to do that and I think also acknowledged these numbers can't tell the whole story about an individual person even though, you know, she went through the numbers analysis. It does say, I mean, this analysis on page 71 talks about, you know, things that are particular to him as an individual who averts, he's no longer affiliated with a gang. So there's both in there in the IJ's opinion. Respectfully, Your Honor, I think she doesn't consider in her legal analysis the fact that he's greenlit a gang defector. You want me to look at just part of the opinion? You keep coming back to only look at what I'm calling the legal analysis, which is this certain page. But as you noted, the opinion's 16 pages long, and this is the only conclusion of the entire opinion is this acquiescence conclusion. So that's the basis for the ruling. So why shouldn't I read the whole opinion? Oh, Your Honor, you should absolutely read the whole opinion. And I think in doing so, it becomes clear that, you know, she's listing a lot of evidence. And in her analysis, she does engage to some extent, but she cherry picks, mischaracterizes and distorts the evidence in the process of doing that. And she disregards critical facts when she comes to her conclusions. And that's something we'd ask the court to look at very seriously, her engagement with the evidence. And in addition to that, also the fact that she uses the incorrect definition of torture in her analysis, borrowing from this colloquial definition of torture. And then finally, on the acquiescence standard, the failure to consider the individual facts in this case that are so critical. And this court acknowledged the importance of considering credible evidence from the petitioner in Avares-Lagos, in Portillo-Flores, because they're so critical to assessing, to understanding in these highly fact-specific cases, whether there's going to be a risk of harm. This court has held that no two claims are the same, that two people facing deportation at the same time to the same country, one might merit deferral under the Convention of Torture, and another might not. And in this case, Your Honors, there's no question that Mr. Ponce-Flores merits deferral under the Convention against Torture because of who he is, a Greenlit gang defector who was recently stabbed by MS-13, who is going to be transferred from U.S. custody to Honduran custody with the document proclaiming his gang membership or prior gang membership and the tattoos that he bears. There's no question that he's going to be tortured by the Honduran government or with their acquiescence. Thank you. Thank you very much. Thank both counsel for their arguments, and we would typically come down and greet you, but we can't do that today. But nonetheless, know that we very much appreciate your being here today.
judges: Albert Diaz, Allison J. Rushing, Toby J. Heytens